**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| MARLENE DEHNER, *Individually and On Behalf of All Others Similarly Situated*,<br><br>Plaintiff,<br><br>v.<br><br>PNC INVESTMENTS, LLC; and PNC FINANCIAL SERVICES GROUP, INC.,<br><br>Defendants. | Case No.<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

## CLASS ACTION COMPLAINT

Plaintiff Marlene Dehner ("Plaintiff"), on behalf of herself and all others similarly situated, brings this action as a class action against defendants PNC Financial Services Group, Inc. ("PNC Financial"), and PNC Investments, LLC ("PNC Investments") (collectively "Defendants").

## I.    INTRODUCTION

1.    A cash sweep account is a type of bank or brokerage account that is linked to an investment account and automatically transfers funds when the balance is above or below a preset minimum. This case arises from Defendants' exploitative and unfair implementation of their PNC Priority Bank Deposit Sweep Program ("Program"), resulting in the breach of Defendants' fiduciary duties owed to Plaintiff and similarly situated retirement account investors as their investment advisors and their contractual obligation pay a "fair and reasonable" rate of interest for "retirement accounts."

2.    Specifically, when acting as their customers' agents and fiduciaries, defendant PNC Financial "sweeps" uninvested cash balances in its customers' accounts and deposits that cash into accounts located at its wholly owned affiliate bank, PNC Bank N.A. ("PNC Bank"). Because PNC Bank's accounts pay far below market rates of interest, Plaintiff and other Class members have

lost significant amounts of interest they would have otherwise earned had PNC Financial swept their uninvested cash into bank accounts that pay a reasonable market interest rate.

3.      In its Retirement Account Customer Agreement (the "Retirement Agreement"), PNC Financial specifically acknowledges that it acts as its customers' "agent" and fiduciary in establishing, maintaining, and operating their retirement accounts. Under the broad scope of the agency, PNC Financial selects the banks to participate in the Program, the type of accounts to which the Program applies, the type of bank accounts in which its customers' funds are swept, the negotiation and agreement as to the interest rates to be paid to its customers under the Program, and the negotiation and agreement as to any compensation or the foregoing of such compensation by Defendants for the benefit of either their customers or another entity, including PNC Bank.

4.      From 2018 through March 2019, and again from March 2022 onwards, when the Federal Reserve began raising the target federal funds rate, the reasonable value of swept cash consistently exceeded the amounts paid by Defendants on sweep accounts. Comparable brokerages such as Fidelity Investments, R.W. Baird, Robinhood, and Vanguard Investments, which did not sweep cash to affiliated banks, but rather swept cash to independent, unaffiliated banks, paid substantially higher rates on swept cash, than Defendants paid. For example, Fidelity paid retirement investors as much as 2.72% APY on swept cash regardless of AUM, starting in August 2023, and R.W. Baird paid retirement investors between 2.07% to 4.15% on swept cash, depending on cash balances, as of September 8, 2023.

5.      Other metrics, including the federal funds rate, and rates paid by online banks, and government money market funds, further evidence that the paltry rates paid by Defendants on retirement sweep accounts were not reasonable.

6.      Defendants breached their fiduciary duties when they placed their customers' cash in low interest-bearing accounts held by their own affiliated bank and then pocketed the unpaid

interest as additional profit.

7.      Plaintiff brings this action individually and on behalf of a Class of similarly situated individuals for breach of fiduciary duty, breach of contract, breach of the implied covenant of good faith and fair dealing, and unjust enrichment, to recover damages arising out of Defendants' violations of the law, and for such other relief as the Court may deem just and proper.

## II.      JURISDICTION AND VENUE

8.      This Court has original jurisdiction over the subject matter of this action under 28 U.S.C. §1332(d)(2), as this action is brought as a class action on behalf of over 100 class members, one or more members of the class are citizens of a state different than the Defendants, and the amount in controversy exceeds five million dollars ($5,000,000), exclusive of interest and costs. The Court has supplemental jurisdiction over the alleged state law claims under 28 U.S.C. § 1367 because they form part of the same case or controversy.

9.      The Court has personal jurisdiction over Defendants because they are either headquartered in this District, have sufficient minimum contacts in this District, and/or intentionally avail themselves of the markets within this District through the promotion, marketing, and sale of their financial services. These facts render the exercise of jurisdiction by this Court necessary and proper.

10.      Venue is proper under 28 U.S.C. § 1391 because two Defendants reside in this District and a substantial part of the events, omissions, and/or relevant conduct by Defendants giving rise to Plaintiff's claims occurred in this District.

## III.      PARTIES

### A. Plaintiff

11.      Plaintiff is a customer of PNC Financial and PNC Investments and is a resident and citizen of Mount Pleasant, Michigan. Plaintiff maintained a managed brokerage account with

Defendants in which cash was held over the course of the life of the account. PNC Investments assigned a manager to her brokerage account who exercised agency and discretion to make decisions for Plaintiff. While Plaintiff was Defendants' customer, the cash held in her account was automatically "swept" into a low interest-bearing bank account at PNC Bank pursuant to the Program.

### B. Defendants

12.     Defendant PNC Financial is headquartered in Pittsburgh, Pennsylvania and incorporated in Pennsylvania. PNC Financial is one of the largest financial services institutions in the United States, with hundreds of billions of dollars in assets. PNC Financial is the parent company of PNC Investments and is named as a defendant in its capacity as the parent company and control person of PNC Investments, LLC.

13.     Defendant PNC Investments is headquartered in Pittsburgh, Pennsylvania and incorporated in Delaware. PNC Investments, LLC is a registered investment adviser and broker-dealer and a member of the Financial Industry Regulatory Authority.

### FACTUAL BACKGROUND

### A. Defendants' Customer Relationship

14.     The relationship between PNF Financial and its retirement account customers, including Plaintiff, is set forth in the written Retirement Agreement.  The Retirement Agreement provide that the Program is governed by the terms and conditions set forth in the Additionally, in PNC Investment's Proprietary Bank Deposit Sweep Program (BDSP$^{SM}$) Disclosure Document ("Program Disclosure").

15.     Through their assent to the Retirement Agreement, customers like Plaintiff consent to their participation in the Program.

16.     The Retirement Agreement and Program Disclosure establish an agency

relationship between Plaintiff and PNC Financial.

17.    By entering a custodial and agency relationship with Plaintiff and members of the putative Class, Defendants assumed fiduciary duties including the duty of loyalty, the duty of care, the duty to act in good faith, the duty of full and fair disclosures, and the duty to make prudent investment recommendations. These fiduciary duties are meant to always ensure Defendants act with integrity and in the best interests of the client.

18.    Defendant's fiduciary duties to as broker-dealers are described in Regulation Best Interest (Reg BI) under the Securities Exchange Act of 1934, which requires them to act in the best interests of the retail customer at the time a recommendation is made. Reg BI obligates broker-dealers, when making an investment recommendation, to meet four core obligations: *Disclosure* (providing certain prescribed disclosure before or at the time of recommendation, about the recommendation and the relationship between the retail customer and the broker-dealer); *Care* (exercising reasonable diligence, care, and skill in making the recommendation); *Conflicts of Interest* (establishing, maintaining, and enforcing policies and procedures reasonably designed to address conflicts of interest); and *Compliance* (establishing, maintaining, and enforcing policies and procedures reasonably designed to achieve compliance with Reg BI).

19.    Defendants' fiduciary duties are also reflected in PNC Financial's Code of Ethics. *See*  https://www.sec.gov/Archives/edgar/data/1277350/000119312504049187/dex99r3.htm.

**B.  The Bank Sweep Program**

20.    A "sweep program" is a "service provided by a broker or dealer where it offers to its customer the option to automatically transfer free credit balances in the securities account of the customer to either a money market mutual fund product as described in § 270.2a-7 or an account at a bank whose deposits are insured by the Federal Deposit Insurance Corporation." *See* 17 CFR 240.15c3-3(a)(17).

21.     Sweep deposits play a pivotal role as a capital source for banks, empowering them to utilize these deposits for various corporate purposes. This includes activities such as making loans or investing in government securities. The disparity between the interest rate paid and the interest rate earned by a bank on those deposits is commonly referred to as the net interest margin ("NIM").

22.     The SEC, in its Staff Bulletin: Standards of Conduct for Broker-Dealers and Investment Advisers Conflicts of Interest, issued August 3, 2022, emphasized that "cash sweep programs" are a "common source[ ] of conflicts of interest." *See* https://www.sec.gov/tm/iabd-staff-bulletin-conflicts-interest.

23.     According to the Program Disclosure, PNC Bank is the *exclusive* option for the Program. Defendants directed all accounts participating in the Program, including Plaintiff's, to their affiliated bank, PNC Bank.

24.     The Program Disclosures provides:

Applicable law governing retirement accounts, such as qualified plans under the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), and individual retirement accounts under the Internal Revenue Code, necessitates that interest rates paid by the Program Bank for deposits in the Deposit Accounts, our fee, and other service fees were negotiated at arm's length, are believed to be fair and reasonable, and are designed to approximate value for the services involved and in the context of customers' Eligible Assets.

25.     Defendants exercised their discretion concerning the Program in bad faith to the detriment of its customers, choosing PNC Bank as the Program Bank that pays an unreasonable rate of interest.

26.     The Program primarily benefited Defendants at the expense of their customers.

27.     Defendants enter transactions by which they establish and pay unreasonably low interest rates to its customers in the Program. In contrast to the unreasonably low returns Defendants pay their customers, Defendants shift to their affiliated bank a substantial portion of

the beneficial returns on its customers' cash that would otherwise constitute their customary compensation in connection with the Program.

28.     The Program Disclosure states: "The Program Bank earns net income from the difference between the interest they pay on Program Deposits and the fees paid to us and the income they earn on loans, investments and other assets." Thus, Defendants admit that by keeping the interest rates in Plaintiff and Class members' Deposit Accounts lower, Defendants earn a higher profit.  The Program Disclosures further acknowledge that the Program creates "a conflict of interest for us because the income received by PNC Bank and us is expected to exceed the income we would receive if a money market fund was used as a core investment vehicle." Finally, the Program Disclosures highlight that that Defendants "may receive more revenue with respect to amounts in the Program than with respect to other sweep products" and that, "[a]s a result of the fees and benefits described above, the Program may be significantly more profitable to us than other available sweep options, if any."

29.     Through their operation of the Program, Defendants engage in self-dealing, creating a profit center that benefits only them, to the financial detriment of their customers.

### C. Defendants Placed Class Members' Cash in Shockingly Low Interest-Bearing Accounts at PNC Bank.

30.     Defendants breached their fiduciary and contractual duties by failing to negotiate higher and reasonable interest rates for their customers' uninvested cash in operating the Program.

31.     As its customers' agent and financial advisor, Defendants were contractually and legally obligated to act in the best interest of its clients. Defendants' practice of extracting excessive fees from its customers' cash sweep deposits, through the negotiation of unreasonably low interest rates with their affiliated bank, PNC Bank, was against its customers' interests.

32.     Defendants did not negotiate higher and reasonable rates of interest for their

customers' cash sweep deposits, but instead it worked in consultation with its affiliated bank to set artificially and unreasonably low interest rates for deposit accounts in the Program.

33.     Defendants' low interest rates are not reasonable. Section 4975 and ERISA Section 408 place the burden of demonstrating reasonableness on the financial institution. Defendants cannot meet this burden because the interest rates they used in the Program do not meet any definition of a reasonable rate.

34.     Based on its ordinary meaning (using Webster's and Oxford dictionary definitions), "reasonable" is synonymous with "fair." Accordingly, "reasonable" in the valuation context is synonymous with "fair market value" and can be determined using a market approach of comparable instruments. A reasonable rate of interest is the rate that would result in a competitive market under fair market conditions – in other words, an interest rate parties would agree to in an arm's length transaction where neither party is about exert market power over the other.

35.     Fair market value is defined by the IRS as: "the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts." 26 C.F.R. § 25.2512-1.

36.     IRS regulations define an "arm's-length interest rate" for purposes of assessing transfer pricing between related entities as

> a rate of interest which was charged, or would have been charged, at the time the indebtedness arose, in independent transactions with or between unrelated parties under similar circumstances. All relevant factors shall be considered, including the principal amount and duration of the loan, the security involved, the credit standing of the borrower, and the interest rate prevailing at the situs of the lender or creditor for comparable loans between unrelated parties. [26 CFR § 1.482-2(a)(2)].

37.     Consistent with the plain meaning of reasonableness, which means fair, a reasonable rate is one that considers other market rates for similar products in arm's-length

transactions.

38.     For example, the Department of Labor, which maintains enforcement authority with respect to the prohibited transaction rules in the Internal Revenue Code, provided in granting the exemption, a definition of "reasonable rate" that considered a broad range of similar products to bank deposit accounts:

> A "reasonable" rate of interest means a rate of interest determinable by reference to short-term rates available to other customers of the bank, those offered by other banks, those available from money market funds, those applicable to short-term instruments such as repurchase agreements, or by reference to a benchmark such as sovereign short term debt (e.g., in the U.S., treasury bills), all in the jurisdiction where the rate is being evaluated.

https://www.federalregister.gov/documents/2003/06/10/03-14594/grant-of-individual-exemptions-deutsche-bank-ag?utm_source=chatgpt.com.

39.     Three-month treasury bills, an instrument the Department of Labor has advised should be considered in determining a reasonable interest rate, rose in yield from 0.046% as of January 1, 2022 to 5.394% as of January 9, 2024. Nevertheless, Defendants paid interest rates during this period that were a tiny fraction of these rates.

40.     Compared to its competitors, the Program's interest rates are substantially lower than similar sweep products offered by other financial institutions. For example, Vanguard offered interest payments of 4.5% in its Cash Sweep Program; Moo Moo offered 5.1% in its Cash Sweep Program; and Fidelity offered 5%.

41.     Other brokerages that swept cash to unaffiliated banks set rates between brokerages and banks resulting from something that more closely resembles arm's-length negotiations. For example, Fidelity Investments and R.W. Baird do not sweep cash to affiliated banks and have consistently paid substantially higher rates of interest than Defendants and other brokerages that sweep cash to affiliated banks.

42.    At year-end 2022, Fidelity paid 2.21% interest on cash balances regardless of tier, and R.W. Baird paid between 1.58% interest (on cash balances up to $1 million) and 3.08% interest (on cash balances above $5 million). By contrast, Defendants have been paying interest rates as low as 0.04%—virtually nothing.

43.    The federal funds target rate continued to increase in 2023 hitting an effective yield of 5.33% on July 27, 2023. As the federal fund rate increased, so too did Fidelity and R.W. Baird continue to increase the rates they paid on swept cash. Defendants, by contrast, continued to pay close to no interest.

44.    The rates set by Fidelity and R.W. Baird at arm's-length are evidence of the fair market or reasonable rates based on business and economic conditions. The rates set by Defendants, by default, in self-interested transactions, are not reasonable.

45.    Defendants interest rates are significantly lower than its competitors, but they are also substantially lower than interest rates for money market fund rates. Nevertheless, Defendants automatically place customers into the cash sweep programs they developed with low yield rates that they negotiated with PNC Bank.

46.    By negotiating significantly lower rates for the cash sweep programs in which they automatically placed Plaintiff and Class members, Defendants did not act in their customers' best interests. Instead, Defendants put their own interests above their customers', making substantial net income revenue at its customers' expense. In so doing, Defendants breached their fiduciary duties, including their own Code of Ethics.

## CLASS ACTION ALLEGATIONS

47.    Plaintiff re-alleges and incorporates by reference the allegations set forth above.

48.    Plaintiff brings this action individually and as a class action pursuant to Rules 23(a), 23(b)(2), and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of the Class consisting of:

All persons who held cash positions in managed brokerage accounts custodied by Defendants and whose cash was subject to Defendants' Program.

49.     Excluded from the Class is (a) any person who held cash positions in self-directed (non-managed) brokerage accounts only whose cash was custodied by Defendants and whose cash was subject to Defendants' Program; (b) any person who held cash positions in retirement accounts only (i.e., who did not have a managed brokerage account) whose cash was custodied by Defendants and whose cash was subject to Defendants' Program; (c) any Judge or Magistrate Judge presiding over this action and members of their immediate families; and (d) Defendants, Defendants' subsidiaries, parents, successors, predecessors, and any entity in which the Defendants or their parents controlling interest and its current or former officers and directors

50.     This action has been brought and may be maintained as a class action under Federal Rule of Civil Procedure 23.

### A.  Numerosity - Rule 23(a)(1)

51.     Class members are so numerous that their individual joinder is impracticable. The precise number of Class members and their identities are unknown to Plaintiff currently. However, Defendants oversee hundreds of billions of dollars in client assets through the work of thousands of financial advisors, and Plaintiff believes that the members of the proposed Class number in the thousands. Accordingly, Plaintiff and the Class satisfy the numerosity requirement of Rule 23.

52.     Class members may be notified of the pendency of this action by mail, published notice, or other appropriate methods.

### B.  Existence and Predominance of Common Questions of Law and Fact - Rule 23(a)(2), 23(b)(3)

53.     Common questions of law and fact exist as to all members of the Class and predominate over questions affecting only individual Class members. These common legal and

factual questions, each of which may also be certified under Rule 23(c)(4), include the following, whether:

    a.    Defendants owed fiduciary duties to Plaintiff and the putative Class members in connection with the Program;

    b.    Defendants breached their fiduciary duties to Plaintiff and the putative Class members in  establishing, maintaining, and/or operating the Program;

    c.    Defendants breached their contract with Plaintiff and the putative Class members regarding the Program, including the implied covenant of good faith and fair dealing;

    d.    Defendants have been unjustly enriched because of the conduct complained of herein;

    e.    this case may be maintained as a class action under Fed. R. Civ. P. 23;

    f.    to what extent Class members are entitled to damages and other monetary relief; and

    g.    and to what extent Class members are entitled to attorneys' fees and costs.

### C.  Typicality - Rule 23(a)(3)

54.    Plaintiff's claims are typical of the claims of the Class because she was a customer of Defendants that had her cash balances improperly managed by Defendants through their administration of the Program. Thus, Plaintiff's claims are typical of the claims of the members of the Class as the claims arise from the same course of conduct by Defendants, and the relief sought within the Class is common to the members of each.

### D.  Adequacy of Representation - Rule 23(a)(4)

55.    Plaintiff will fairly and adequately protect the interests of Class members. Plaintiff has retained counsel competent and experienced in complex class action litigation, and Plaintiff

will prosecute this action vigorously. Plaintiff has no interests adverse or antagonistic to those of the Class.

**E.  Superiority - Rule 23(b)(3)**

56.     A class action is superior to all other available means for the fair and efficient adjudication of this controversy. The damages or other financial detriment suffered by individual Class members are small compared with the burden and expense that would be entailed by individual litigation of their claims against Defendants. It would thus be virtually impossible for the Class members, on an individual basis, to obtain effective redress for the wrongs done them.

57.     Even if Class members could afford individualized litigation, the court system could not. Individualized litigation would create the danger of inconsistent or contradictory judgments arising from the same set of facts. Individualized litigation would also increase the delay and expense to all parties and the court system from the issues raised by this action. By contrast, the class action device provides the benefits of adjudication of these issues in a single proceeding, economies of scale, and comprehensive supervision by a single court, and presents no unusual management difficulties under the circumstances here.

58.     Additionally, the Class may be certified under Rule 23(b)(1) and/or (b)(2) because:

a.  the prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudications with respect to individual Class members that would establish incompatible standards of conduct for Defendants;

b.  the prosecution of separate actions by individual Class members would create a risk of adjudications with respect to them which would, as a practical matter, be dispositive of the interests of other Class members not parties to the adjudications, or substantially impair or impede their ability to protect their interests; and/or

c.  Defendants have acted or refused to act on grounds generally applicable to the

Class, thereby making appropriate final and injunctive relief with respect to the Class members as a whole.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### BREACH OF FIDUCIARY DUTY

(Asserted on behalf of the Plaintiff and the
Class against Defendants)

59.     Plaintiff repeats and incorporates by reference the factual allegations in paragraphs 1 through 58, above, as if fully set forth herein.

60.     At all relevant times, Defendants owed fiduciary duties to Plaintiff and the members of the Class in connection with the Program. Such duties independently arose out of (1) the agency relationship between Defendants, on one hand, and Plaintiff and the members of the Class on the other hand, as to the Program; (2) Defendants holding and control over beneficial funds that belonged to its customers, related to their cash sweep balances; (3) Defendants' discretion as to the Program and their customers' cash, while acting as their agent; and/or (4) the applicable industry standards, including Reg BI, FINRA standards, and Defendants' Code of Ethics.

61.     As a fiduciary to Plaintiff and the Class, Defendants owed them the highest duties of loyalty, candor, due care, and prudence in the services they provided to them in connection with establishing, maintaining, and/or operating the Program. Moreover, as a fiduciary, Defendants had a continuing duty to act exclusively for the benefit of Plaintiff and the Class in connection with establishing, maintaining, and/or operating the Program. Lastly, as a fiduciary, Defendants had a continuing duty to obtain informed consent from Plaintiff and the Class regarding the Program, and specifically make sufficiently detailed disclosures regarding the Program, their role, the role of various related parties, and any conflicts of interest to obtain such informed consent.

62.     Defendants further owed Plaintiff and the Class the fiduciary duty to act in good

faith in connection with establishing, maintaining, and/or operating the Program.

63.    Defendants further owed Plaintiff and the Class the duty to charge reasonable fees for their services related to the Bank Deposit Sweep Program.

64.    Plaintiff and the Class were fully dependent upon Defendants' ability, skill, knowledge, and goodwill with respect to Defendants' Program.

65.    Defendants owed Plaintiff and the Class similar duties by virtue of their control over Defendants' policies or management regarding Program.

66.    Defendants breached their fiduciary duties by the conduct alleged herein, including by designing, structuring, and/or operating the Program to benefit themselves at the expense of their fiduciary customers, making material misrepresentations and omissions regarding the Program, violating its duty of care, and acting in their own – not their customers' – best interest vis-à-vis the Program.

67.    Defendants violated their duty of loyalty by, among other things, putting their interest above that of their fiduciary customers, failing to provide sufficient information to their fiduciary customers regarding material features of the Program to obtain informed consent from them, and not properly disclosing their own and their affiliates' role in, and conflicts of interest arising out of the Program, as more fully shown above.

68.    As a direct and proximate consequence of Defendants' conduct as alleged herein, Plaintiff and the Class suffered damages in an amount to be determined at trial and seek disgorgement of any undue and unjust gains of Defendants, as well as all other equitable relief deemed just and proper.

## SECOND CAUSE OF ACTION
### BREACH OF CONTRACT

(Asserted on behalf of the Plaintiff and the
Class against Defendants)

69.    Plaintiff repeats and incorporates by reference the factual allegations in paragraphs 1 through 58, above, as if fully set forth herein.

70.    Defendants' relationship with its customers is governed by a written contract, the terms of which are contained in, and incorporated into various standardized documents drafted by Defendants, as outlined above.

71.    Defendants contractually promise that "interest rates paid by the Program Bank for deposits in the Deposit Accounts, our fee, and other services fees were negotiated at arm's length, are believed to be fair and reasonable, and are designed to approximate value for the services involved and in the context of customers' Eligible Assets."

72.    Defendants undertook to act as an agent of the customers regarding all transactions relating to the Program and were thus contractually obligated to obtain for Plaintiff and members of the proposed Class, through such transactions, rates of return on their cash balances that are reasonable and to otherwise act in their clients' best interests.

73.    As set forth herein, the rates of return paid to customers on their cash balances were not reasonable and Defendants did not act in their clients' best interests. Accordingly, Defendants breached their contracts with Plaintiff and the members of the proposed Class.

74.    Plaintiff and the members of the proposed Class suffered monetary damages because of Defendants' breach of contract.

## THIRD CAUSE OF ACTION
### BREACH OF THE IMPLIED COVENANT
### OF GOOD FAITH AND FAIR DEALING
(Asserted on behalf of the Plaintiff and the Class
Classes against Defendants)

75.    Plaintiff repeats and incorporates by reference the factual allegations in paragraphs

16

1 through 58, above, as if fully set forth herein.

76.    A covenant of good faith and fair dealing is implied into every contract.

77.    Plaintiff and Class members contracted with Defendants to provide them with financial and/or investment services pursuant to the Retirement Agreement. Under the Retirement Agreement, Defendants were agents of Plaintiff and Class members and owed them fiduciary duties, including to act in their best interests. Defendants failed to obtain for Plaintiff and Class members higher and reasonable rates of return on their cash balances and instead acted in Defendants' own interests. Moreover, under the Retirement Agreement, as broker-dealers and pursuant to Reg. BI and 84 Fed. Reg. 134, 17 C.F.R. § 276, Defendants had a duty to act in the best interests of Plaintiff and Class members and not put their interests above Plaintiff and Class members.

78.    These contracts were subject to implied covenants of good faith and fair dealing that all parties would act in good faith and with reasonable efforts to perform their contractual duties (both explicit and implied) and not to impair the rights of other parties to receive the rights, benefits, and reasonable expectations under the contracts. These included the covenants that Defendants would act fairly and in good faith in carrying out their contractual obligations to provide Plaintiff and Class member with fair and reasonable rates of return on their cash sweep balances.

79.    Defendants breached these implied covenants of good faith and fair dealing by failing to provide Plaintiff and Class members with fair and reasonable rates of return on their cash sweep balances. Defendants, instead of providing fair and reasonable rates of return on their clients' cash sweep balances, provided far below market rates of return that their clients could have otherwise earned on their cash. Defendants acted dishonestly and failed to exercise and/or abused

their discretion in selecting the banks which would hold Plaintiff and Class members' cash balances and in failing to negotiate reasonable rates of interest but instead negotiated higher rates of interest and fees for themselves.

80.     Plaintiff and Class members fulfilled all the terms and obligations of their contract, including paying for Defendants' services.

81.     Defendants' failure to act in good faith in providing fair and reasonable rates of return on their customers' cash sweep balances denied Plaintiff and Class members the full benefit of their bargain. Plaintiff and Class members received a minimal return on their cash sweep balances that were less than what they could have otherwise earned and less than their reasonable expectations under their contract with Defendants.

82.     As a result of Defendants' breach of the implied covenant of good faith and fair dealing, Plaintiff and Class members sustained damages in an amount to be determined by this Court, including interest on all liquidated sums.

<u>**FOURTH CAUSE OF ACTION**</u>
**UNJUST ENRICHMENT**
(Asserted on behalf of the Plaintiff and
the Class against Defendants)

83.     Plaintiff repeats and incorporates by reference the factual allegations in paragraphs 1 through 58, above, as if fully set forth herein.

84.     This cause of action is pled in the alternative to the extent it is determined there is no enforceable contract.

85.     Because of Defendants' wrongful conduct as alleged herein, Plaintiff and Class members received lower interest payments on their cash sweep balances than they would have in a reasonable and fair market.

86.     Because of Defendants' wrongful conduct as alleged herein, Defendants unjustly

received a benefit at the expense of Plaintiff and Class members in the form of increased interest income that belonged to Plaintiff and Class members.

87.    It would be unjust and inequitable to allow Defendants to retain these wrongfully obtained benefits.

88.    Plaintiff and Class members are entitled to restitution and disgorgement of the benefits unjustly obtained, plus interest, in an amount to be proven at trial.

## PRAYER FOR RELIEF

Plaintiff requests relief as follows:

1.    Certification of the Class under applicable Rule 23 provisions;

2.    A declaration that the Program violates Plaintiff's and Class members' rights to a reasonable rate of interest on their sweep accounts;

3.    Actual damages;

4.    Attorneys' fees and costs of suit;

5.    Prejudgment and postjudgment interest; and

6.    Such other relief as the Court deems just and proper

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all claims so triable.

Dated: January 29, 2025                    Respectfully submitted,

**KOPLEOWITZ OSTROW FERGUSON
WEISELBERG GILBERT**
Kenneth J. Grunfeld
PA Bar No. 84121
65 Overhill Road
Bala Cynwyd, PA 19004
Tel: 954-525-4100
grunfeld@kolawyers.com


**EDELSBERG LAW, P.A.**
Scott A. Edelsberg, Esq.*
Florida Bar No. 100537
scott@edelsberglaw.com
Adam A. Schwartzbaum, Esq.
Florida Bar No. 93014
adam@edelsberglaw.com
20900 NE 30th Ave Suit 417
Aventura, FL 33180
Tel: 305-975-3320

**SHAMIS & GENTILE, P.A.**
Andrew J. Shamis, Esq.*
Florida Bar No. 101754
ashamis@shamisgentile.com
14 NE 1st Avenue, Suite 1205
Miami, Florida 33132
Telephone: 305-479-2299


*Counsel for Plaintiff and the Proposed Class*

*\*Pro Hac Vice Applications to be Filed*